

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **LEONARDO MARTINEZ AND** | § | |
| **JOSE MARTINEZ** | § | |
| | § | |
| **VS.** | § | **B-01-76** |
| | § | |
| **CAMERON COUNTY IRRIGATION,** | § | |
| **IRRIGATION DISTRICT #2** | § | |

## *PLAINTIFFS' RESPONSE TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

TO THE HONORABLE JUDGE HILDA TAGLE:

COME NOW, **LEONARDO MARTINEZ and JOSE MARTINEZ**, Plaintiffs in the above-entitled and numbered cause, and file this their Response to the Defendant's Motion for Summary Judgement and would show as follows:

### I.

### UNDISPUTED ISSUES

Plaintiffs do not dispute the essential nature of the case as set forth by the Defendant in its Motion for Summary Judgment. Neither do they dispute the procedural history & stage of the proceedings nor the status of discovery as outlined by the Defendant.

### II.

### DISPUTED FACTS

The Plaintiffs disagree with the Defendant's rendition of "undisputed facts". As set forth below, the Plaintiffs take a contrary position as to the "good faith belief" formed by the manager of the Defendant. The Plaintiffs stand firm in their position, that the Defendant's basis for their

termination were simply pretextual. Plaintiffs will show that the Defendant has failed to carry its burden as required by Rule 56, Fed. R. Civ. P. and that there is a genuine dispute so as to preclude summary judgment.

### A. Summary Judgment Standard.

Summary Judgment may only be granted where there is no "genuine issue as to any material fact related to an essential element of a claim such that the moving party is entitled to judgment as a matter of law." (Citations omitted) A dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-248,(1986).

### B. The Free Speech Argument-Was it a Matter of Public Concern?

The Defendant has essentially set forth the facts surrounding the two instances where the Plaintiffs had contact with an individual director and their comments before the Defendant's Board of Directors. In the one instance, while admittedly a chance meeting, between the Martinez' and Gus Cantu, one of the members of the Board of Directors of the Defendant, it nevertheless led to a revelation by Leo Martinez, that he had observed an operator of heavy equipment, drinking on the job. (Exhibit A-L. Martinez deposition pg. 20 ln. 9-25 & pg. 21 ln1-22) The second instance was at the invitation of the Board of Directors to comment on issues surrounding the workings of the District itself. Again, Leo Martinez stated that "sometimes operators were drinking, operating heavy equipment." (Exhibit A-L.Martinez deposition pg. 14 ln. 11). The drinking by operators of heavy equipment were of concern to Martinez because of the potential for injury to the employee himself and others. (Exhibit A-L. Martinez depo. Pg. 18 ln. 8-13)

Whether speech is addressed to a matter of public concern is a question of law to be decided by the court based on the content, form , and context of a given statement as revealed by the record

as a whole. *Coughlin v. Lee,* 946 F.2d 1152, 1156 n.3 (5th Cir. 1991) In making this determination, the court should examine whether the speech can be "fairly considered as relating to [a] matter of political, social, or other concern to the community." *Connick v. Myers,* 461 US 138 (1983) Simply because the statements are controversial or inappropriate does not mean that they do not deal with a matter of public concern. *Rankin v. McPherson,* 483 U.S. 378 (1987) Rather, "debate on public issues should be uninhibited, robust, and wide open, and ...may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Victor v. McElveen* 150 F.3d 451, 456 (5th Cir. 1998), *quoting New York Times Co. v. Sullivan.* The disclosure of misbehavior by public officials is a mater of public interest and therefore deserves constitutional protection. *Brawner v. City of Richardson, Texas,* 855 F.2d 187, 191-192 (5ht Cir. 1988). "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials...concerns matter of public import." *Thompson v. City of Starkville, Missiissippi,* 901 F.2d 456, 463 (5th Cir. 1990). "The content of a public employee's speech may relate to a public concern for purposes of First Amendment analysis if it does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of a manager's status as an arm of government." *Branton v. City of Dallas* No. 99-11206 WL1398532 (5th Cir. 2001) Thus, in making an analysis of the content of the public employee's speech the court should focus on whether the content relates strictly to personal matters or those which are of "great consequences to the public. *Brawner v. City of Richardson* @191-192. Likewise "if releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." *Branton citing Kennedy v. Tangipahoa Paris Library Bd. Of Control* 224 F3d 359, 372 (5th Cir. 2000).

The court must now then apply these principles of law to the evidence with reasonable

constructions and inferences drawn in favor of the non-mover. Taken as a whole, the reporting of

alcohol consumption on the job by heavy equipment operators is significantly more than an

employee grievance and is an issue of "public concern". *A fortiori*, when the alcohol consumption

is known by the employee's supervisor and nothing is done, the public needs to know and needs to

be protected. (Exhibit A-L. Martinez depo pg. 20 ln. 19- pg. 21 ln. 10)

C. No violation of District Policy

The Defendant has set forth as one of the reasons for the termination of the plaintiffs was

their failure to follow the "chain of command with regard to their complaints." see Defendant's

Motion for Summary Judgment pg. 5. As shown above, the complaints were those involving official

misconduct and thus protected speech. However, even if that were not the case, the District's own

manager admits in her deposition testimony that there was no policy in effect that prohibited any

employee from making comments or having discussions with Board members. (Exhibit B- S.

Kaniger deposition pg. 32 ln. 15-18) Additionally, Kaniger admits that there was no jump in the

chain of command if a Board member stops an employee and asks for information and such an event

would not be considered "jumping the chain of command". (Exhibit B- Kaniger deposition pg. 31

ln 15-20) The "jumping the chain of command" basis for termination of both Martinez brothers was

a pretext for exercising their First Amendment rights.

D. The Disruptive Employee - A Balancing Test

The Defendant has articulated in its motion for summary judgment that the Martinez brothers

had a "Disruptive Effect" on the employer by their "jumping of the chain of command". This it

contends sufficed for its decision to terminate the Plaintiffs. Neither in its brief nor in the evidence

presented does the Defendant point to one instance where the protected speech was the cause of any

disruption of the District's work. In order to make this determination, Courts have employed a

balancing test.   On the one hand the court considers  the "interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees" with that of the

employee's interest in making his statement. *Pickering v. Board of Education*, 391 U.S. 563 (1968).

The court in performing this balancing test considers the manner, time and place of the employee's

expression as begin relevant, as is the context in which the dispute arose.  "The Supreme Court has

recognized as pertinent considerations ' whether the statement impairs discipline by superiors or

harmony among co-workers, has a detrimental impact on close working relationships for which

personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties

or interferes with the regular operation of the enterprise." *Victor v. McElveen,* 150 F.3d 45, 458 (5th

Cir. 1998) (quoting *Pickering*, 391 U..S. at 570-73) While the 5th Circuit has noted that avoiding

interference with work, personnel relationships, or the speaker's job performance can detract from

the public employer's function, nevertheless such disruption must be real and not imagined.  Indeed

disruption is required, and the 'close working relationship' exception cannot serve as a pretext for

stifling legitimate speech..." *McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (5th Cir. 1983).   Here

the Defendant has failed to demonstrate, without dispute as to material facts, a state interest that

outweighs Martinez' First Amendment rights.   Martinez' statements made both inside and outside

of the work place have not been shown to have disrupted the workplace.   Viewed in the light most

favorable to the Martinez' the evidence of record shows that the statements caused no unanticipated

delays or disruption or interference with the work of the Irrigation District. Nor has the Defendant

offered any evidence to establish what if any detrimental effects the protected speech had on any

"close working relationships. In short, the Defendant can point to no evidence that would permit this

court to consider that a "disruption" occurred, much less that it had any detrimental effect on the

operation of the Defendant.   Given the standard of review for summary judgment and the

Defendant's failure to produce any evidence,  the Defendant's Motion for Summary Judgment on the First Amendment Issue must fail.

E.  Failure to report to work

While the Defendant has not sought summary judgment on the basis of the Plaintiffs' at will status, it nevertheless has set forth as one of the reasons for termination the failure of the plaintiffs' to report to work after two days absence to attend a funeral.  It is undisputed that the employees obtained permission for two days leave for a funeral. (Exhibit B. S. Koniger deposition pg. 8 ln. 25 - pg. 9 ln. 10) However, it is disputed whether or not they received permission for a third day. (Exhibit C- Jose Martinez deposition pg. 38 ln. 1-6) Nevertheless, the Defendant's own policy permits up to three days emergency leave for death in the family. (Exhibit D sec. 8.03) Additionally, the District's Absence Without Leave policy provides that absence without leave for "16 consecutive hours in an employee's schedule may, at the discretion of the General Manager, be considered as abandonment of the employee's duties and as a voluntary resignation." ( Exhibit D Section 8.07 )   Finally, in its Job Attendance and Punctuality section the Defendant notes that " [a]ny employee absent from assigned work for two (2) consecutive days without appropriate notice or authorization may be terminated." (Exhibit D- Section 7.02) Obviously, neither of the Plaintiffs was absent for more than 16 consecutive hours or two consecutive days.  The Defendant's establishment of a clear policy and then ignoring it  is at least some evidence of  pretext.

F.  Worker's Compensation Retaliation

Given that only Jose Martinez suffered an on the job injury, that his immediate supervisor was disagreeable about his seeking treatment and his termination within a short period of time of the injury, is sufficient evidence to permit a jury to infer that Jose's termination was as a result of his seeking  medical  treatment.    Section  451.001  et.  seq.  of  the  Texas  Labor  Code  prohibits

discrimination on against an employee because he or she seeks the protection of the worker's compensation laws of the State of Texas. Circumstantial evidence sufficient to establish a causal link between termination and filing a compensation claim includes: (1) knowledge of the compensation claim by those making the decision on termination; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. *Continental Coffee v. Casarez*, 937 S.W. 2d 444 (Tex. 1996). Here the negative attitude of the Defendant, coupled with it animus due to the "chain of command" violation suffices under Texas law to permit the trier of fact to make a determination if the employee's claim for worker's compensation was a cause of the termination.

III.

Plaintiffs Abandon All Other Claims

The Plaintiffs hereby abandon all claims based on the Texas Commission for Human Rights on the basis of race or national origin..

WHEREFORE, Plaintiffs move this Honorable Court Deny the Defendant's Motion for Summary Judgment as it relates to the First Amendment Claims of the Plaintiffs and as to the Worker's Compensation retaliation claim as it relates to Jose Martinez.

Respectfully submitted,

**LAW OFFICES OF RUBEN R. PEÑA, P.C.**
P. O. Box 530160
222 W. Harrison
Harlingen, Texas 78550
Telephone: (956) 412-8200
Facsimile: (956) 412-8282

BY:_____
       **RUBEN R. PEÑA**
       Federal I.D. No. 1416
       State Bar No. 15740900

       ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

    I, RUBEN R. PEÑA, hereby certify that on this the 20th day of February , 2002, a true and correct copy of the foregoing, Motion to Extend Time to File a Response to the Defendant's Motion for Summary Judgment, has been forwarded, via facsimile and by certified mail, return receipt requested, to the undersigned:

       Ric J. Navarro
       Denton & Navarro
       222 East Van Buren, Suite 405
       Harlingen, Texas 78550

    _____
    **RUBEN R. PEÑA**

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| LEONARDO MARTINEZ and | X | |
| JOSE MARTINEZ, | X | |
|     Plaintiffs | X | |
| | X | |
| VS. | X | C.A. NO. B-01-076 |
| | X | |
| CAMERON COUNTY IRRIGATION | X | |
| DISTRICT NO. 2 | X | |
|     Defendant | X | |

- - - - - - - - - - - - - - - - - - - -

ORAL DEPOSITION OF LEONARDO MARTINEZ
OCTOBER 24, 2001

- - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY
CERTIFIED COURT REPORTER


APPEARANCES

COUNSEL FOR PLAINTIFFS:

    RUBEN R. PENA
    LAW OFFICES OF RUBEN R. PENA, P.C.
    222 West Harrison
    Harlingen, Texas 78550

COUNSEL FOR DEFENDANT:

    RICARDO J. NAVARRO
    DENTON, NAVARRO & BERNAL
    Bank of America Building
    222 East Van Buren, Suite 405
    Harlingen, Texas  78550


ALSO PRESENT:   Sonia Kaniger


**EXHIBIT" B "**

Case 1:01-cv-00076   Document 23   Filed in TXSD on 02/20/2002   Page 11 of 32

**Page 2**

1    Oral deposition of LEONARDO MARTINEZ, who resides in

2   Cameron County, Texas, taken by RICARDO J NAVARRO,

3   Attorney for Defendant, reported by MAUREEN STINGLEY,

4   Certified Court Reporter in and for the State of Texas,

5   on OCTOBER 24, 2001, in the offices of Ruben Pena, 222

6   West Harrison, Harlingen, Texas.

7

8               INDEX

9

Appearances ---------------------------------   1

10

Examination by Mr. Navarro ------------------   3

11

Errata Sheet --------------------------------   57

12

Signature page ------------------------------   58

13

Reporter's Certificate ----------------------   59

14

Attached to the end of the transcript: Stipulations

15

16

17         DOCUMENTARY EVIDENCE

18   Ex. No.   Description      Marked   Iden.

19           (No Exhibits Marked)

20

21

22

23

24

25

**Page 3**

1        LEONARDO MARTINEZ,

2 having been duly sworn, testified as follows:

3        EXAMINATION

4 BY MR. NAVARRO:

5    Q. Mr. Martinez, my name is Ric Navarro, and you

6 have been sitting here through the deposition of your

7 brother.

8    A. Yes, sir.

9    Q. And so you have heard a lot of what I have had

10 to say already, but, since we're making a separate

11 record, there will be some repetition involved, okay?

12    A. Yes, sir.

13    Q. Like your brother, it's my understanding that

14 you are fluent in English and that we do not need a

15 translator here today; is that correct?

16    A. That's correct.

17    Q. And that, like your brother, you used to work

18 at the district?

19    A. That's correct.

20    Q. And that you two have filed a separate petition

21 in the case in connection with your termination of

22 employment?

23    A. That's correct.

24    Q. Just to sort of keep the record real clear on

25 it, you were also hired in, what, late April?

**Page 4**

1    A. Yes, sir.

2    Q. Of the year 2000?

3    A. Yes, sir.

4    Q. And then fired on May 25th of the year 2000,

5 correct?

6    A. That's correct, yes, sir.

7    Q. All right. And is it correct that when you

8 were first hired you worked on the same crew that your

9 brother, Jose, worked on, in which Henry Turrubiates

10 was the crew leader?

11    A. That's correct, sir.

12    Q. And that's where you started out?

13    A. That's correct.

14    Q. And what were your job duties there in that

15 crew?

16    A. I guess labor. You know, we used to do

17 concrete and fix gates, you know.

18    Q. Okay, the manual labor that was associated with

19 that crew?

20    A. Correct.

21    Q. Besides your brother, who else was on -- we

22 mentioned a Tony Ramirez.

23    A. That's correct.

24    Q. Okay, who else was on that crew? Do you recall

25 anybody else?

**Page 5**

1    A. And the leadman, Enrique, Henry.

2    Q. And Henry?

3    A. Yes, sir.

4    Q. Anybody else besides the ones we have covered?

5    A. No.

6    Q. All right. Now, at a certain point in time,

7 you were moved from that crew?

8    A. That's correct, sir.

9    Q. All right. And it sounded like you were moved

10 sometime in the middle of the time when you started and

11 the time you were fired.

12    A. Yes, sir.

13    Q. All right. What do you know about the reasons

14 for being moved?

15    A. I feel they had opened another crew.

16    Q. Okay.

17    A. And I was moved to that crew.

18    Q. Okay. Who was the crew leader on that crew?

19    A. I really can't remember his name.

20    Q. You don't remember Do you remember the names

21 of anybody else on that crew?

22    A. No, not really.

23    Q. No, okay. And that's fine. Whatever you

24 remember is what we want to know. Tell me how -- who

25 first told you that you were going to be transferred or

Page 14

1   A  Because sinc: I star   -- when my brother told
2   you that I had me with -- we were going by and we
3   saw :
4   Q  Gus, yeah.
5   A. -- Gus and we stopped, he told me that, well,
6   you know, if everything was going well there.
7   Q  Right.
8   A. And I told him, "Well" -- he said, "Tell me the
9   truth," and I told him the truth.
10  Q. Which was what?
11  A. Sometimes operators were drinking, operating
12  heavy equipment. There was a lot of things going on,
13  and he said, "Well, okay." And that's why I went over
14  there and that's why I explained to Sonia. And Gus was
15  there, and he told Sonia, "Do you think that's going
16  to -- you're going to count against Leo," and she said
17  no, and he started putting pressure.
18  Q. Okay. This was all said at the meeting itself?
19  A. Yes.
20  Q. Okay, so basically Gus introduced you to the
21  rest of the board?
22  A. Yes, sir.
23  Q. And then he asked you to tell them what you had
24  told him, or what?
25  A. Yes, sir, yes, sir. He told me -- I said,

Page 15

1   "Gus, I just wanted to work here."
2           He said, "You tell me the truth."
3   Q. But that conversation happened when you met him
4   out --
5   A. Yes.
6   Q. -- out where, on the street somewhere?
7   A. Yes.
8   Q. You-all ran into each other?
9   A. We were going toward Santa Maria.
10  Q. Okay. And we're going to talk about that a
11  little bit more, but let's go back to the meeting. So
12  had you asked Gus to talk to the board?
13  A. No.
14  Q. So when you were at work that morning, when you
15  went to work that morning, you didn't know that you
16  were going to be asked to go to the board?
17  A. No, sir.
18  Q. All right, and do you know whether Gus is the
19  one that asked that you be brought in?
20  A. I don't know, sir.
21  Q. You have no idea?
22  A. No, sir.
23  Q. All right. And once you were brought in, Gus
24  introduced you to everybody?
25  A. Yes, sir.

Page 1

1   Q. All right. And what did he ask you to do?
2   A. To tell the board what I knew about, you know,
3   some things that they were doing wrong there.
4   Q. Okay. And were you under the impression that
5   he wanted you to tell the rest of the board what
6   you-all had talked about the time that you had met with
7   him?
8   A. Yes, sir.
9   Q. Okay. So what did you tell the board that
10  time?
11  A. I told them, you know, that there was an
12  operator drinking. We were in the bottom of the canal,
13  and he was drinking. He was operating heavy equipment
14  that was dangerous to us because he was drinking.
15  Q. Okay.
16  A. Okay? And then --
17  Q. Did you tell him who the operator was, by the
18  way?
19  A. Yes.
20  Q. And who was it?
21  A. Andrew.
22  Q. Andrew --
23  A. I don't know. Aguilar?
24  Q. Okay. And that's something that happened while
25  you -- that you witnessed yourself?

Page 17

1   A. Yes, sir.
2   Q. Okay, and you recognized that Andrew had been
3   drinking or was intoxicated?
4   A. He was drinking out of his water jar  He would
5   pull it up, and he was drinking beer from there.
6   Q. Okay, so he was drinking beer?
7   A. Yes, sir.
8   Q. Did he appear to you to be intoxicated?
9   A. I didn't went up to him to see.
10  Q. All right. How did you know that he was
11  drinking?
12  A. I saw him put it in the can.
13  Q. Okay. So you were near enough at some point to
14  where you could see --
15  A. Yeah, because it was a big hole, and I was
16  afraid when he was drinking -- maybe he had a hangover
17  or something, and I don't want to be involved there,
18  you know, if something happens or something. You know,
19  he was operating the machine.
20  Q. All right. But did that happen -- did you
21  witness Andrew pulling out a beer and drinking --
22  A. Yes, sir.
23  Q. -- on more than one occasion?
24  A. That one time.
25  Q. Just that one time?

Page 18

1　A. Yes, sir.
2　Q. Okay. So we're talking about one incident that
3　you saw?
4　A. Yes, sir.
5　Q. And when you saw that, was that when you were
6　still working on Henry's crew?
7　A. Yes, sir
8　Q. Okay. And so when you saw that -- and it
9　sounds like you were kind of concerned about whether
10　Andrew was going to do something that could end up
11　getting either himself or you hurt.
12　A. Yes, well, not just me but the rest of the
13　people.
14　Q. Other people.
15　　　(Off the record)
16　Q. Okay, so we're talking about one incident with
17　Andrew. So when you ran into Gus on the street and you
18　told him about that, obviously that had happened
19　sometime before you ran into Gus, right? The thing
20　with Andrew happened before when you talked to Gus,
21　obviously, right?
22　A. Yes.
23　Q. My question is how much time had gone by
24　between the time that that happened with Gus and the
25　time that you mentioned it -- excuse me -- the time

Page 19

1　that you had -- that Andrew's drinking had happened and
2　you saw that and the time that you ran into Gus?
3　A. It was about a week and a half.
4　Q. Okay. Now, when you saw that Andrew was
5　drinking, you saw him opening a beer, did you bring
6　that to Henry's attention?
7　A. Did I bring that up to Henry's attention?
8　Q. Yes, Henry the crew leader.
9　A. Henry knows about it.
10　Q. Well, we will talk about that, but I'm saying
11　did you go tell Henry about it?
12　A. That, no.
13　Q. No? Did you tell anybody about it besides when
14　you told Gus?
15　A. No.
16　Q. Okay, did you bring it to Emilio's attention?
17　A. No.
18　Q. Did you confront Andrew about it?
19　A. No.
20　Q. So you didn't go up to Andrew and say, "Hey,
21　man, what are you doing? We're working."
22　A. No.
23　Q. You didn't say anything to Andrew?
24　A. No.
25　Q. You didn't say anything to Henry, right?

Page 2

1　A. No, I didn't say anything.
2　Q. And you didn't say anything to Emilio?
3　A. No.
4　Q. And you didn't say anything to anybody else
5　there at the site?
6　A. No.
7　Q. Is that right?
8　A. Correct.
9　Q. Okay, and so the first time that you would have
10　said anything to anyone else was when you said it to
11　Gus?
12　A. Correct.
13　Q. Is that right?
14　A. I said it to Gus because Gus wanted to know.
15　Q. Okay. I understand. If you hadn't run into
16　Gus and talked to Gus and he hadn't asked you anything,
17　you probably wouldn't have said it to him, right?
18　A. No.
19　Q. All right, and you probably would not have said
20　anything to anybody else about it, at least at that
21　time, right?
22　A. Because there was some -- most everybody knew
23　that he had been drinking on the job.
24　Q. All right. Yeah, what you're saying is it was
25　common knowledge that Andrew was drinking on the job?

Page 21

1　A. It was just like if I said it to Emilio, it
2　was just --
3　Q. He would have said, "What's the big deal?"
4　A. Yeah.
5　Q. Okay. And so that's your perception there,
6　that, you know, "Hey, it wouldn't have made any
7　difference"?
8　A. Yeah.
9　Q. Is that right?
10　A. Yeah.
11　Q. Okay. My question is a little bit different in
12　that what I'm saying is that since -- aside from
13　whether everybody knew about it, if you hadn't happened
14　to run into Gus and he hadn't asked you anything, you
15　probably wouldn't have said anything to him either.
16　A. Correct.
17　Q. All right. And the only reason -- and what
18　you're saying to me is the only reason you even said it
19　to him is because he said, "Hey, what's going on, how
20　is it going?" He asked you about operations at the
21　district?
22　A. Correct.
23　Q. Okay, now, you were in the room earlier when
24　Joe was saying that the conversation with Gus was
25　really kind of limited to pleasantries or, "How is it

# EXHIBIT "B"

Case 1:01-cv-00076   Document 23   Filed in TXSD on 02/20/2002   Page 15 of 32

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| LEONARDO MARTINEZ and | X |
| JOSE MARTINEZ, | X |
|      Plaintiffs | X |
| | X |
| VS. | X   C.A. NO. B-01-076 |
| | X |
| CAMERON COUNTY IRRIGATION | X |
| DISTRICT NO. 2 | X |
|      Defendant | X |

- - - - - - - - - - - - - - - - - - - - - - -

ORAL DEPOSITION OF SONIA KANIGER
OCTOBER 24, 2001

- - - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY
CERTIFIED COURT REPORTER


APPEARANCES

COUNSEL FOR PLAINTIFFS:

   RUBEN R. PENA
   LAW OFFICES OF RUBEN R. PENA, P.C.
   222 West Harrison
   Harlingen, Texas 78550

COUNSEL FOR DEFENDANT:

   RICARDO J. NAVARRO
   DENTON, NAVARRO & BERNAL
   Bank of America Building
   222 East Van Buren, Suite 405
   Harlingen, Texas  78550


EXHIBIT" A "

Page 2

1      Oral deposition of SONIA KANIGER, who resides

2 in Cameron County, Texas, taken by RUBEN R. PENA,

3 Attorney for Plaintiffs, reported by MAUREEN STINGLEY,

4 Certified Court Reporter in and for the State of Texas,

5 on OCTOBER 24, 2001, in the offices of Ruben Pena, 222

6 West Harrison, Harlingen, Texas.

7

8            INDEX

Appearances ---------------------------------   1

SONIA KANIGER
10 Examination by Mr. Pena ---------------------   3
    Examination by Mr Navarro -------------------   47
11 Examination by Mr. Pena ---------------------   52

12 Errata Sheet --------------------------------   54
    Signature page ------------------------------   55
13 Reporter's Certificate ----------------------   56

14 Attached to the end of the transcript: Stipulations

15

16        DOCUMENTARY EVIDENCE

17 EX. NO.    DESCRIPTION         MARKED   IDEN.

18    1      Agenda for board meeting    38     38

19

20      REQUESTED DOCUMENTS/INFORMATION

21 NUMBER   DESCRIPTION             PAGE

22    1      Names of employees who replaced
23         Plaintiffs . . . . . . . . . . . . . . .   28

24    2      Minutes of board meeting . . . . . . .   38

25

---

Page 4

1   Q. Who is the most recent one before you became --

2   A. Don Carrell.

3   Q. Is that C-A-R-R --

4   A. E-L-L.

5   Q. I'm sorry?

6   A. C-A-R-R-E-L-L.

7   Q. And before you were office manager, were you

8 employed by the irrigation district?

9   A. Correct.

10   Q. What did you do?

11   A. I was the bookkeeper.

12   Q. And how long were you bookkeeper there?

13   A. I have been there a total of 24 years.

14   Q. The difference -- okay, would it be fair to say

15 you were bookkeeper, office manager and general

16 manager?

17   A. I started off as clerk, office clerk, then

18 bookkeeper, then office manager, then assistant office

19 manager -- I'm sorry -- assistant office manager, then

20 office manager, assistant general manager, and then

21 general manager.

22   Q. Were you assistant general manager under Don

23 Carrell?

24   A. Under Clarence Magouirk, who was interim.

25   Q After Mr. Carrell?

---

Page 3

1         SONIA KANIGER,

2 having been duly sworn, testified as follows:

3         EXAMINATION

4 BY MR. PENA:

5   Q. Would you tell us your name for the record,

6 please?

7   A. Sonia Kaniger.

8   Q. And, Ms. Kaniger, where are you employed?

9   A Cameron County Irrigation District No. 2 in San

10 Benito.

11   Q. And what is your position there?

12   A. General manager.

13   Q. How long have you been general manager?

14   A. It will be two years December.

15   Q. Okay, and you worked there prior to that being

16 the general manager, correct?

17   A. Correct.

18   Q. And what was your title then?

19   A. Office manager.

20   Q. And how long did you hold the position of

21 office manager?

22   A. Approximately 10 years.

23   Q. In the 10 years that you were the office

24 manager, who was the general manager?

25   A. There were several general managers.

---

Page 5

1   A. Correct.

2   Q. And how long were you an assistant general

3 manager?

4   A. About eight months.

5   Q. The irrigation district is a governmental

6 entity; is that correct?

7   A. Correct.

8   Q. It's run by a board of directors?

9   A Yes, sir.

10   Q. And who are the current board of directors?

11   A. Obie Atkinson.

12   Q. Obie --

13   A. Obian, yes, Atkinson.

14   Q. Okay.

15   A. Eddie Snyder, Bill McMurray, Gus Cantu, and

16 Pedro Vasquez.

17   Q Were these the members on the board at the time

18 that both Leo and Joe Martinez were terminated?

19   A. Yes, sir.

20   Q. And is the general manager hired by the board

21 of directors?

22   A. Yes, sir.

23   Q. So you report directly to them?

24   A. Yes, sir.

25   Q. How often does the board meet?

Page 6

1 A. Twice a month.
2 Q. Are these public meetings?
3 A. Yes, sir.
4 Q. Do you have executive sessions?
5 A. Yes, sir.
6 Q. Are the executive sessions tape-recorded?
7 A. No, sir.
8 Q. Is there a certified agenda?
9 A. Yes, sir.
10 Q. Have you ever had your deposition taken before?
11 A. Yes, sir.
12 Q. Okay, how many times?
13 A. I think just once before.
14 Q. Okay. In what kind of a case?
15 A. It was last week here at your office.
16 Q. Last week here?
17 A. Uh-huh, the week before.
18    MR. NAVARRO: Munoz.
19    MR. PENA: Oh, on the Munoz case, okay.
20 Thank you.
21 Q. Did John Eaton cover that for me?
22 A. Yes, he did.
23 Q. And other than that, you have never given your
24 testimony in a setting such as this?
25 A. I don't recall that I have, no.

Page 7

1 Q. Okay, how about in a courtroom, have you ever
2 had to testify in a courtroom?
3 A. Yes, I have.
4 Q. Okay, about how many times?
5 A. Once.
6 Q. Was that recent?
7 A. No, sir. It was probably about 15, 20 years
8 ago.
9 Q. All right. You understand -- I'm sure you have
10 had an opportunity to visit with Mr. Navarro about what
11 we're doing here today?
12 A. Yes, sir.
13 Q. You understand that I represent Jose and Leo
14 Martinez in this case?
15 A. Yes.
16 Q. Okay. During this deposition if I ask you a
17 question that you don't understand or is totally
18 incomprehensible, which very likely will happen, please
19 tell me to rephrase it and I'll do so, okay?
20 A. Okay.
21 Q. If you need to take a break at any time, just
22 let me know and I'll be happy to accommodate you.
23 A. Okay.
24 Q. Can you tell me in your own words why Jose
25 Martinez was terminated?

Page

1 A. I was getting reports from his supervisor, who
2 was Emilio Trevino at the time, that the workers -- the
3 rest of the workers were getting upset at things that
4 were being said by both Jose and his brother.
5 Q. Okay. So we're talking about both Jose and
6 Leo?
7 A. Yes, sir. They were causing a lot of turmoil
8 amongst the employees.
9 Q. Okay. Tell me what it was that they were
10 purportedly saying.
11 A. They had connections with board members and
12 they could get employees fired if they wanted to and,
13 when they would become supervisors, that certain
14 employees would not be working.
15    So the employees were getting upset at the
16 fact that they had been employed longer than these two
17 gentlemen, the Martinez brothers, and felt that if
18 anybody should become supervisors, people or employees
19 that have been there longer should be given the
20 opportunity first.
21 Q. Okay. So you were getting reports from
22 Mr. Trevino about the workers being upset by statements
23 that Jose and Leo were making?
24 A. Yes, sir.
25 Q. Okay, what else? What other reason were they

Page 9

1 terminated?
2 A. His supervisor, Emilio Trevino, came to me one
3 morning and told me that both Leo and Jose had been to
4 the warehouse in the morning at 8:00, or just
5 previously before 8:00, and asked him if they could
6 have two days off for a funeral. His supervisor
7 granted them the two days. On the third day, they did
8 not come back to work, and the supervisor reported that
9 to me. And I asked him what he wanted to do at that
10 point, and he recommended termination.
11 Q. And who was this supervisor, Trevino?
12 A. Emilio Trevino, yes, sir.
13 Q. You were here while both Jose and Leo were
14 testifying?
15 A. Yes, sir.
16 Q. Okay. Did you hear them testify that they
17 spoke to their supervisor about needing an additional
18 day off because of another death in the family?
19 A. No, sir, I didn't hear that.
20 Q. At any rate, Mr. Trevino didn't tell you that
21 either Jose or Leo had asked for additional time off?
22 A. No, sir, what he told me was that they had
23 asked for two days off and they took three.
24 Q. Did they come back on the fourth day?
25 A. Yes, sir.

Page 30

1 leaders?
2    A. Enrique Mendiola.
3    Q. Uh-huh.
4    A. I'm trying to remember the other one.
5    Q. I'll leave a blank for that.
6    A. Okay.
7    Q. If you remember it during the deposition, just
8 tell me and we will go back, okay?
9    A. Yes.
10    Q. And does your memory reflect pretty much the --
11 I guess the chain of events as Mr. Jose Martinez
12 testified that he was on the tractor one day and then
13 he went to the funeral and then he came back and he was
14 terminated?
15    A. Yes, sir, that's right. It was Lupe Garza.
16    Q. I'm sorry?
17    A. It was Quadalupe Garza, the other mower crew
18 leader.
19    Q. And are they both still employed by the
20 district?
21    A. Mr. Garza has retired. Mr. Mendiola is still
22 employed.
23    Q. What personal knowledge do you have that Jose
24 Martinez ever spoke to any board member other than what
25 you heard here today?

Page 31

1    A. At the board meeting, Mr. Gus Cantu, the board
2 member, said that he had been in contact or he had had
3 some discussions with the Martinez brothers.
4    Q. Okay. All right.
5    A. He didn't say specifically which of the two.
6    Q. Did you ever talk to Mr. Cantu after the
7 meeting about the issues that he had brought up?
8    A. No, sir.
9    Q. At any rate, you have no way of rebutting, or
10 you don't have any personal knowledge that what
11 Mr. Jose Martinez, in fact, said occurred on that one
12 instance where Mr. Cantu stopped him and Leo is not
13 true?
14    A. I don't have any knowledge of it.
15    Q. Would you agree with me that if Jose Martinez's
16 version of what occurred that afternoon when Mr. Cantu
17 stopped him, that in fact Mr. Jose Martinez did not
18 jump the chain of command?
19    A. If that was the instance?
20    Q. Yeah.
21    A. Yes.
22    Q. When you terminated Jose Martinez, did you ask
23 him about what was said between him and Mr. Cantu?
24    A. No, sir.
25    Q. After the board meeting -- and let's just be

Page

1 clear about that. The board meeting that we're talking
2 about is when Leo Martinez spoke in executive session,
3 correct?
4    A. Correct.
5    Q. Jose Martinez never spoke at that meeting,
6 correct?
7    A. Correct.
8    Q. Was he there?
9    A. No, sir.
10    Q. And you would agree with me that there is
11 nothing in violation of your board policies that would
12 prohibit employees from talking to board members about
13 things that did not relate to the irrigation district?
14    A. Correct.
15    Q. Is there anything in the policies that prohibit
16 an employee from speaking to a board member if the
17 board member has requested information from him or her?
18    A. No, sir, I don't think there is.
19    Q. Do you have any information that would indicate
20 that, in fact, Jose Martinez or Leo Martinez instigated
21 the conversations with Gus Cantu or any other board
22 member?
23    A. No, I don't have any.
24    Q. And the only information you have is the
25 information that was provided to you by Emilio Trevino

Page 33

1 and what you heard and observed at the board meeting?
2    A. Yes, sir.
3    Q. Now, the board meeting that we were referring
4 to, do you remember what date that was?
5    A. I don't.
6    Q. Okay. I know you provided it to me.
7      MR. PENA: Let's go off the record for
8 just a second.
9      (Brief recess)
10    Q. Let me show you what your attorney has produced
11 in our request for production as Exhibit G. It appears
12 to be a letter from Mr. Navarro to the Texas Commission
13 on Human Rights with the irrigation district's position
14 statement. Do you see that?
15      MR. NAVARRO: What number is that?
16      MR. PENA: I guess this is Bates stamp 53,
17 Page 53.
18    Q. Do you see that? If you will flip over to the
19 next page, 54, Bates stamp 54 --
20    A. Yes.
21    Q. All right, first of all, let's make sure we
22 have identified it. This is the position statement of
23 the Cameron County Irrigation District No. 2 to
24 Mr. Leonardo Martinez's charge of discrimination,
25 correct?

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

LEONARDO MARTINEZ and       X
JOSE MARTINEZ,              X
      Plaintiffs        X
                  X
VS.                        X   C.A. NO. B-01-076
                  X
CAMERON COUNTY IRRIGATION   X
DISTRICT NO. 2             X
      Defendant          X

- - - - - - - - - - - - - - - - - - - - - -

ORAL DEPOSITION OF JOSE MARTINEZ
OCTOBER 24, 2001

- - - - - - - - - - - - - - - - - - - - - -

REPORTED BY MAUREEN STINGLEY
CERTIFIED COURT REPORTER


APPEARANCES

COUNSEL FOR PLAINTIFFS:

    RUBEN R. PENA
    LAW OFFICES OF RUBEN R. PENA, P.C.
    222 West Harrison
    Harlingen, Texas 78550

COUNSEL FOR DEFENDANT:

    RICARDO J. NAVARRO
    DENTON, NAVARRO & BERNAL
    Bank of America Building
    222 East Van Buren, Suite 405
    Harlingen, Texas  78550

ALSO PRESENT:   Sonia Kaniger
               Leonardo Martinez


EXHIBIT" B "

Case 1:01-cv-00076   Document 23   Filed in TXSD on 02/20/2002   Page 21 of 32

**Page 2**

1    Oral deposition of JOSE MARTINEZ, who resides in

2    Cameron County, Texas, taken by RICARDO J. NAVARRO,

3    Attorney for Defendant, reported by MAUREEN STINGLEY,

4    Certified Court Reporter in and for the State of Texas,

5    on OCTOBER 24, 2001, in the offices of Ruben Pena, 222

6    West Harrison, Harlingen, Texas.

7

8

9                        INDEX

10   Appearances ------------------------------    1

11   Examination by Mr Navarro ----------------    3

12   Errata Sheet -----------------------------    73

13   Signature page ---------------------------    74

14   Reporter's Certificate -------------------    75

15   Attached to the end of the transcript: Stipulations

16

17                DOCUMENTARY EVIDENCE

18   Ex. No.   Description              Marked  Iden.

19                  (No Exhibits Marked)

20

21

22

23

24

25

---

**Page 3**

1                    JOSE MARTINEZ,

2    having been duly sworn, testified as follows:

3                    EXAMINATION

4    QUESTIONS BY MR. NAVARRO:

5    Q. Good afternoon, Mr. Martinez.

6    A. Good afternoon.

7    Q. My name is Ricardo Navarro, and sitting next to

8    me is Sonia Kaniger, who you know is the general

9    manager of the irrigation district. We're here today

10   so that I can ask you some questions about your

11   lawsuit. Do you understand that?

12   A. I do.

13   Q. It's my understanding that you are fluent in

14   English and that we can conduct this deposition without

15   a translator; is that correct?

16   A. That's correct.

17   Q. All right. Have you ever had a deposition

18   taken before or been in a proceeding like this?

19   A. No.

20   Q. All right. Basically, the way it's going to

21   work, it's kind of like as if we were in court except

22   we're here in the offices of Mr. Pena. And it's kind

23   of informal, but you're still under oath. Do you

24   understand that?

25   A. Yes.

---

**Page**

1    Q. And it's an opportunity for me to ask you about

2    your lawsuit, about the facts, about what happened, wh

3    said what, who did what when, so that I can get a

4    better idea of what it is that you're claiming, okay?

5    And then Mr. Pena is going to have some more

6    opportunity to ask my client questions, okay?

7    A. Okay.

8    Q. Now, your full name, it's my understanding, is

9    Jose Manuel Martinez?

10   A. Yes.

11   Q. And your social security number is 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?

12   A. Yes, sir.

13   Q. Okay, and your Texas driver's license number is

14   what, sir?

15   A. I don't recall my license number.

16   Q. Okay. Well, let me see. I'm looking here --

17   do you still hold an Indiana driver's license?

18   A. Yes, I do.

19   Q. All right, and are you still operating under

20   that license?

21   A. Yes, I am.

22   Q. Okay, so you don't have a Texas driver's

23   license right today, do you?

24   A. No.

25   Q. Okay. Let me show you -- I have a copy of an

---

**Page 5**

1    Indiana license that appears to be yours. Does that

2    look like your license?

3    A. Yes.

4    Q. Okay. And let me see, your date of birth is

5    what, sir?

6    A. 11-14-54.

7    Q. Okay. And your employment application

8    indicates that you received a GED in 1982; is that

9    correct?

10   A. That's correct.

11   Q. And from where? Where did you achieve that

12   GED?

13   A. In Indiana.

14   Q. In Indiana, all right. Are you a -- I also

15   notice that you have a permanent resident card in the

16   file. Are you a citizen of the country of Mexico?

17   A. Yes.

18   Q. Okay. And do you have permanent resident alien

19   status in the United States?

20   A. Yes, I do.

21   Q. Okay. Where in Mexico are you from?

22   A. Vera Cruz.

23   Q. I'm sorry?

24   A. Vera Cruz.

25   Q. Vera Cruz, okay. From the city and state of

Page 38

1　A. Well, we had a funeral. My aunt had passed
2　away, and we asked permission, and we was given
3　permission, and we went to those funerals. And when we
4　came back -- I think it was two or three days
5　afterwards -- we went to work, and we were told that we
6　were wanted at the office by Sonia.
7　Q. By Sonia?
8　A. Yeah.
9　Q. Okay. So you actually -- well, when did that
10　funeral occur? Did it occur after the second meeting
11　with Sonia but before the last one? I was left with
12　the impression that you actually went to work on the
13　tractor for a couple of days.
14　A. I worked a day on the tractor and then went to
15　the funeral.
16　Q. Okay. So you would have gone to the funeral
17　after your meeting with Sonia about being reassigned to
18　the tractor?
19　A. Yes, yes.
20　Q. Okay. And you say that you got permission to
21　go?
22　A. Yes.
23　Q. From who?
24　A. Emilio.
25　Q. Trevino?

Page 40

1　A. I don't know. I can't say.
2　Q. And so what you're saying is that Emilio said,
3　"That's fine. You can go"?
4　A. Yes, sir.
5　Q. And when you came back to work, was it -- did
6　you work a day or so before you were told to come tal'
7　to Sonia, or was that the first thing that happened
8　when you got back?
9　A. That's the first thing that happened in the
10　morning.
11　Q. When you got back?
12　A. Yes, sir.
13　Q. Okay, and who is it that told you that you
14　needed to come talk to Sonia?
15　A. Emilio.
16　Q. All right. Did he go with you to the office?
17　A. Yes, he did.
18　Q. Was he present when Sonia talked to you?
19　A. Yes, he was.
20　Q. And did Sonia fire you -- did she tell you she
21　was firing you?
22　A. Yes.
23　Q. Face to face?
24　A. Yes.
25　Q. Okay, in her office?

Page 39

1　A. Trevino.
2　Q. And you actually -- when was the first time you
3　knew that you wanted to or needed to go to the -- was
4　it a family member?
5　A. My aunt.
6　Q. All right. When was the first time you knew
7　that you needed to go or felt that you needed to go to
8　the funeral?
9　A. Well, I talked to my mother, and she had told
10　me that my aunt had passed away, and I told her that I
11　had to go to work and ask for permission.
12　Q. Where was the funeral, by the way?
13　A. Three Rivers, Texas.
14　Q. All right. So it's like two or three hours
15　from here?
16　A. Yes, sir.
17　Q. And did you actually talk to Emilio face to
18　face, or did you call him, or tell me how that went.
19　A. No, I talked to him face to face.
20　Q. And you said you wanted to take a day to go do
21　this, right?
22　A. Yes, sir.
23　Q. Did you fill out any paperwork?
24　A. No.
25　Q. Did he fill out any paperwork?

Page 41

1　A. In her office.
2　Q. And so she was there and you were there and
3　Emilio was there?
4　A. Yes, and my brother and his supervisor.
5　Q. Okay, and Leonardo was there?
6　A. And his supervisor.
7　Q. And his supervisor, okay. Who was who?
8　A. Joe, I think was his name.
9　Q. Joe Gomez?
10　A. I think so.
11　Q. All right.
12　A. It's something like that. I don't recall his
13　name.
14　Q. All right. You recall his name to be Joe?
15　A. Yes.
16　Q. All right, so the very last meeting that
17　happened with Sonia was when she actually fired both
18　you and Leonardo?
19　A. Both of us.
20　Q. Both of you?
21　A. Me and Leonardo.
22　Q. Yeah, okay. Well, tell me what Sonia said.
23　A. She said that she had heard that we had been
24　talking to some people and that we had not been
25　following the chain of command. And I said, "Chain of

# EXHIBIT "D"

# CAMERON COUNTY
# IRRIGATION DISTRICT NO. II

## Personnel and Policies
## Manual

EXHIBIT" _C_ "   0032

# CAMERON COUNTY IRRIGATION DISTRICT NO. II
## PERSONNEL AND POLICIES MANUAL

## TABLE OF CONTENTS

PAGE

## SECTION I.
## PURPOSE AND AUTHORITY

1.00 Purpose.................................................................................... 1
1.01 Authority.................................................................................. 1
1.02 Effective Date.......................................................................... 2
1.03 Applicability............................................................................ 2
1.04 Authority for Establishing Position........................................ 2

## SECTION II.
## GENERAL POLICIES

2.00 This Manual............................................................................. 2
2.01 Drug Free Workplace.............................................................. 3
2.02 Sexual Harassment.................................................................. 3
2.03 Non-Discrimination................................................................ 3
2.04 Dress Code.............................................................................. 4
2.05 Workers Compensation.......................................................... 4

## SECTION III.
## ADMINISTRATION

3.00 Administration........................................................................ 5
3.01 Relations with Board of Directors.......................................... 5
3.02 Department Heads................................................................... 6
3.03 Amendments to this Manual
3.04 Personnel Records.................................................................. 7
3.05 Grievance Procedure............................................................... 7

# SECTION VIII.
## HOLIDAYS, VACATIONS AND LEAVES

8.00 Holidays................................................................................................ 15
8.01 Vacation Leave..................................................................................... 16
8.02 Sick Leave/Personal Leave.................................................................. 16
8.03 Emergency Leave................................................................................. 18

8.04 Military Leave...................................................................................... 18
8.05 Citizenship Leave................................................................................ 18
8.06 Absence Without Pay.......................................................................... 18
8.07 Absence Without Leave....................................................................... 19
8.08 Family and Medical Leave.................................................................. 19

# SECTION IX.
## COMPENSATION

9.00 Compensation Determination.............................................................. 22
9.01 Pay Policy........................................................................................... 22
10.00 Evaluations....................................................................................... 22

# SECTION XI.
## NONDISCIPLINARY SEPARATION
## RESIGNATION, LAYOFF AND INCAPACITY

11.00 Resignation....................................................................................... 23
11.01 Layoff/Termination .......................................................................... 23
11.02 Incapacity......................................................................................... 23

# SECTION XII
## DISCIPLINARY ACTIONS
## DISMISSALS AND APPEALS

12.00 Disciplinary Actions ........................................................................ 24
12.01 Dismissal .......................................................................................... 25
12.02 Appeal ............................................................................................... 25

0034

# SECTION IV.
## INITIAL EMPLOYMENT INFORMATION AND REQUIREMENTS

4.00 Applications............................................................................ 8
4.01 Political Restrictions/Activity.......................................... 8
4.02 Medical Examination........................................................ 8

# SECTION V.
## ORIENTATION AND TRAINING

5.00 Job Orientation................................................................
5.01 Job Training...................................................................... 9
5.02 Probationary Period......................................................... 9
                                                                              9

# SECTION VI.
## WORKING HOURS, NATURAL DISASTERS AND EMERGENCIES, AND LUNCH BREAKS

6.00 Working Hours.................................................................
6.01 Natural Disasters and Emergencies................................. 10
6.02 Lunch Breaks................................................................... 10
                                                                              11

# SECTION VII.
## EMPLOYEE CONDUCT

7.00 General Conduct...............................................................
7.01 Work Rules....................................................................... 11
7.02 Job Attendance and Punctuality...................................... 11
7.03 Safety............................................................................... 13
7.04 Use of District Vehicles, Equipment and Supplies.......... 13
7.05 Driving Records............................................................... 14
7.06 Outside Employment........................................................ 14
                                                                              15



## 7.02 Job Attendance and Punctuality



Each employee is expected to be on the job during the established hours of operation of the department in which the employee is employed, unless the absence is specifically authorized by the employee's department head or supervisor. An employee absent due to reasons beyond the employee's control is responsible for notifying the employee's department head or supervisor as soon as possible. Any employee absent from assigned work for two (2) consecutive days without appropriate notice or authorization may be terminated. Excessive absenteeism will be documented by supervisors and department heads, and may result in termination. If an employee must for some reason be tardy, the employee must notify the department head or supervisor as soon as possible. A record of employee tardiness will be maintained by each department head to identify cases where excessive tardiness adversely impacts department performance. Excessive tardiness is also grounds for disciplinary action or dismissal. Deductions from pay will be made for all unexcused absences and periods of tardiness.

## 7.03 Safety

Safety is the continual job of every District employee. Recognizing the need to get the job done, it is the obligation of each employee to avoid accidents and any conduct likely to lead to accidents. Safety rules which shall be observed by all employees, include, but are not limited to, the following:

(a) All District employees are expected to conform to all safety requirements required by the District and to wear all necessary safety equipment.

(b) Employees may not engage in any activity which may endanger the safety of employees or others while on the job.

(c) Employees must notify their supervisor or department head of any reason which may preclude them from accomplishing their assigned tasks.

(d) Employees shall report all unsafe conditions immediately to supervisors or department heads.

(e) Employees injured while working are required to seek immediate medical attention as may be appropriate under the circumstances. When hurt on the job, notify your supervisor or department head as soon as possible.

Eligible employees may use up to three (3) days per calendar year of accrued sick leave as personal leave with the approval of the employee's department head and the General Manager.

## 8.03 Emergency Leave

Paid emergency leave of up to three working days may be extended to an employee in the event of a death in the employee's immediate family. Immediate family shall be defined as an employee's spouse, children, parents, parents-in-law, brother, sister, grandparents, brother-in-law, or sister-in-law. The General Manager or department head may grant an employee unpaid leave to accommodate the employee's attendance at a funeral of someone other than a member of the immediate family, or to serve as a pallbearer.

## 8.04 Military Leave

Regular employees of the District who are members of the State Military Forces or members of any of the Reserve Components of the Armed Forces of the United States are entitled to paid leave of up to fifteen days per calendar year for authorized training or duty ordered by proper authority. Employee requests for military leave must include a copy of the relevant military orders. Military leave for periods in excess of fifteen (15) days will be charged to vacation leave or leave without pay. Regular full-time employees of the District who enter active duty with the State Military Forces or with the Armed Forces of the United States are entitled to be restored to employment, subject to the provisions of applicable law upon honorable release from active duty.

## 8.05 Citizenship Leave

Employees will be granted paid citizenship leave for jury duty, serving as a subpoenaed witness in an official proceeding, and for the purpose of voting.

## 8.06 Absence Without Pay

A department head may grant an employee an unpaid leave of absence upon request by the employee, if such leave is warranted under the circumstances.

0053

## 8.07 Absence Without Leave

An employee who fails to report for duty or remain at work as scheduled without proper notice or authorization shall be considered absent without leave. Absence without leave for 16 consecutive hours in an employee's schedule may, at the discretion of the General Manager, be considered as abandonment of the employee's duties and as a voluntary resignation.

## 8.08 Family and Medical Leave

The District will comply with all applicable requirements of the Family and Medical Leave Act of 1993 ("FMLA").

The FMLA entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in any 12-month period for certain family and medical reasons. The FMLA applies to all public agencies and private employers with more than fifty employees.

Employees eligible for FMLA leave are those who:

1)   have been employed by the District for at least 12 months (which need not be consecutive);

2)   have worked for the District for at least 1,250 hours during the 12-month period immediately preceding the date the leave begins; and

3)   who work for an employer with more than 50 total employees within a 75 mile radius.

Eligible employees may take leave for the following reasons:

1)   to care for a child upon birth or upon placement for adoption or foster care;

2)   to care for a parent, spouse, or child with a serious health condition; or

3)   when an employee is unable to work because of the employee's own serious health condition.

0054

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **LEONARDO MARTINEZ AND** | § | |
| **JOSE MARTINEZ** | § | |
| | § | |
| **VS.** | § | **B-01-76** |
| | § | |
| **CAMERON COUNTY IRRIGATION,** | § | |
| **IRRIGATION DISTRICT #2** | § | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**IN PART AND GRANTING IN PART**

On this day the Court considered the Defendant's Motion for Summary Judgment and the

Plaintiffs' Response, and after considering the motion and arguments of counsel, the Court believes

that the Motion should be DENIED in part and GRANTED in Part. It is therefore

ORDERED, ADJUDGED AND DECREED that the Defendant's Motion for Summary

Judgment on the First Amendment Claim of the Plaintiffs and the Defendant's Motion for Summary

Judgment on the Plaintiff Jose Martinez' retaliation claim under 451.001 et. seq. of the Texas Labor

Code is hereby Denied. The Defendant's Motion for Summary Judgment on Race and National

Origin is Granted.

Signed this _____ day of February, 2002 in Brownsville, Texas.

_____

JUDGE PRESIDING



*Law Offices*
*of*
*Rubén R. Peña P.C.*

February 20, 2002

***Via AV's Delivery***

Michael N. Milby
U. S. District Court
600 E. Harrison #101
Brownsville, Texas 78520

   Re: Civil Action No. B-01-76
     ***Leonardo Martinez and Jose Martinez v. Cameron County Irrigation District #2***

Dear Mr. Milby:

   Enclosed, for filing, please find the original and one copy of Plaintiffs' Response to the Defendant's Motion for Summary Judgment accompanied by Order Denying Defendant's Motion for Summary Judgment In Part and Granting in Part. After the filing of same, we ask that you present these documents to the Court for disposition.

   By copy of this letter with enclosures, all counsel of record have been advised of the filing of same.

   Thank you for your assistance. With kindest regards, I remain

      Yours very truly,

      **LAW OFFICES OF RUBEN R. PEÑA, P.C.**

      BY:_____
      **RUBEN R. PEÑA**

RRP:nez
Encls.
cc: Via Facsimile 956-421-3621 & CMRRR
  Ricardo J. Navarro
  Valerie R. Esparza
  Denton, Navarro & Bernal
  222 East Van Buren, Suite 405
  Harlingen, Texas 78550

*222 W. Harrison  Harlingen, TX 78550  P.O. Box 530160*
*(956) 412-8200  1-800-807-1879  Fax (956) 412-8282  Riolaw1@aol.com*

*P.O. Box 781363  San Antonio, TX 78278-1363  1-800-807-1879  Riolaw2@aol.com*